**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SETTLER, LLC<br><br>Plaintiff,<br>v.<br><br>BRIDGET URGO HOME LLC (F/K/A THE SETTLER HOME, LLC) and BRIDGET URGO<br><br>Defendants. | Case No.: 3:26-CV-00822 (VAB)<br><br><br><br>AUGUST 31, 2026 |

## ANSWER AND COUNTERCLAIMS

Defendants Bridget Urgo Home LLC f/k/a The Settler Home, LLC and Bridget Urgo (collectively, "Ms. Urgo" or "Defendants"), by and through their undersigned counsel, hereby respond to the allegations in the Complaint of The Settler, LLC in accordance with the numbered paragraphs thereof, state their defenses to each claim asserted against them, and assert counterclaims, as set forth herein.

## ANSWER

1. Admitted.

2. Defendants admit that Plaintiff provides moving and relocation management services, but lacks knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 2, and on that basis denies them.

3. Admitted that on or about September 10, 2023, Ms. Urgo began working with Plaintiff as co-owner and that she signed a Confidentiality and Non-Competition Agreement ("NCA"). Defendants deny the remaining allegations of Paragraph 3, including any

characterization that Ms. Urgo was an employee, that the NCA was entered into at arms-length, that its execution was a condition precedent to the professional arrangement, or that it remained in force as drafted without being amended over time by custom or practice.

4. Admitted except to deny that Ms. Urgo was an employee of the Settler at any time.

5. Denied except to admit Ms. Urgo formed the company and identified herself as the Managing Member.

6. Admit that the professional relationship ended on or around May 15, 2026, but denied insofar as Paragraph 6 suggests Ms. Urgo was employee at that or any other time.

7. Denied except to admit that on or around May 21, 2026, Ms. Urgo amended the name of the company to Bridget Urgo Home.

## JURISDICTION

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

## FACTUAL BACKGROUND

12. Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 12, and on that basis deny them.

13. Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 13 and on that basis deny them.

14. Defendants admit that Jacqueline Randall acquired ownership of the business, but lack knowledge or information sufficient to admit or deny the remaining allegations of Paragraph

14, including whether or not Pinny "sold" the business to Ms. Randall or allowed Ms. Randall to pay for such ownership rights using company funds.

15. Admitted.

16. Admitted.

17. Admitted except to deny the characterization that Ms. Urgo was an employee as opposed to professional collaborator.

18. Admitted.

19. Denied. Defendants aver that agreed upon terms were reached but supportive documentation for the numbers asserted was never provided.

20. Denied. Defendants aver that Ms. Urgo did not "end" the negotiations and further aver that "the value of the company" could not be sufficiently determined due to lack of disclosure by Plaintiff and Ms. Randall.

21. Denied.

22. Denied.

**FIRST COUNT**
**(Trademark Infringement)**

23. Defendants repeat and reallege their responses to Paragraphs 1 through 22 as if fully set forth herein.

24. Defendants admit that there is a word mark issued at No. 4,312,787 for The Settler.

25. Defendants admit that there is a document attached as Exhibit A and state that it speaks for itself.

26. Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 26, and on that basis deny them.

27. Defendants admit that the LLC name "The Settler Home LLC" was adopted for a limited period, but deny the remaining characterizations of Paragraph 27, including any characterization that the name was adopted for any reason other than a good-faith belief that the businesses would remain affiliated. Defendants further deny that any further use of "the Settler" was wrongful and aver that The Settler Home domain, Instagram handle @settlerhome, and email address bridget@thesettlerhome.com were in use as of the Fall of 2023—long before this dispute.

28. Defendants admit that there is a document attached as Exhibit B and state that it speaks for itself.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

**SECOND COUNT**
**(Unfair Competition Under the Lanham Act)**

35. Defendants repeat and reallege their responses to Paragraph 1 through 34 as if fully set forth herein.

36. Admitted except to deny that The Settler had sole ownership of the domain name The Settler Home. Defendants aver that Ms. Urgo, in her capacity as co-owner, was a co-creator of the rebranded website and all rebranded marketing materials.

37. Admitted that Ms. Urgo's email signature block included references to The Settler while she was professionally collaborating with the Settler, including but not limited the period of

time in which she was publicly acknowledged as co-owner; Defendants deny the remaining allegations of Paragraph 37, including any characterization that Ms. Urgo was an employee.

38. Defendants admit that there is a document attached as Exhibit C and state that it speaks for itself.

39. Denied except to admit that the name was adopted for a limited period on the good-faith belief that the businesses would remain affiliated.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

**THIRD COUNT**
**(Copyright Ownership)**

46. Defendants repeat and reallege their responses to Paragraphs 1 through 45 as if fully set forth herein.

47. Admitted that Ms. Urgo prepared certain works during the course of her professional collaboration, but denied as to remaining, including any characterization that Ms. Urgo was an employee or that the works were created or prepared by Ms. Urgo "for" the Settler such that they are owned exclusively by the Settler.

48. Denied in so far as the allegations of Paragraph 48 characterize the referenced materials as owned exclusively by the Settler.

49. Defendants deny that Ms. Urgo has wrongly declared ownership over any works to which she was not entitled.

50. Defendants deny that Ms. Urgo has wrongly declared ownership over the Instagram account created and operated by Ms. Urgo from long before her professional collaboration with The Settler.

51. Denied.

**FOURTH COUNT**
**(Copyright Infringement)**

52. Defendants repeat and reallege their responses to Paragraphs 1 through 51 as if fully set forth herein.

53. Defendants admit that there is a Copyright Registration No. VA0002505982, entitled The Settler Social Media Photos that was registered after the filing of this lawsuit.

54. Denied.

55. Denied.

56. Denied.

**FIFTH COUNT**
**(Breach of Contract)**

57. Defendants repeat and reallege their responses to Paragraphs 1 through 56 as if fully set forth herein.

58. Denied except to admit that Ms. Urgo signed a document titled "Confidentiality and Non-Competition Agreement."

59. Defendants admit that there is a document attached as Exhibit D and state that it speaks for itself.

60. Defendants deny any interpretation or characterization of the averred language as enforceable or binding on Ms. Urgo.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

## SIXTH COUNT
## (Breach of Duty of Loyalty)

69. Defendants repeat and reallege their responses to Paragraphs 1 through 68 as if fully set forth herein.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

## SEVENTH COUNT
## (Civil Theft)

78. Defendants repeat and reallege their responses to Paragraphs 1 through 77 as if fully set forth herein.

79. Denied.

80. Denied.

81. Denied.

**EIGHTH COUNT**
**(Conversion)**

82. Defendants repeat and reallege their responses to Paragraphs 1 through 81 as if fully set forth herein.

83. Denied.

84. Denied.

85. Denied.

86. Denied.

**NINTH COUNT**
**(Computer Crimes)**

87. Defendants repeat and reallege their responses to Paragraphs 1 through 86 as if fully set forth herein.

88. Denied except to admit that Ms. Urgo had full, authorized access coextensive with The Settler's other co-owner.

89. Denied.

90. Denied insofar as the allegations characterize any conduct by Ms. Urgo as wrongful, otherwise outside of the scope of her authorized access, or done without the express knowledge or consent of Jacqueline Randall.

91. Denied.

92. Denied.

93. Denied.

**TENTH COUNT**
**(CUTPA)**

94. Defendants repeat and reallege their responses in Paragraphs 1 through 93 as if fully set forth herein.

95. Denied.

96. Denied.

97. Denied.

**PRAYER FOR RELIEF**

Defendants deny each and every allegation, statement, and matter not expressly admitted or qualified here. Defendants deny that Plaintiff is entitled to any of the relief sought herein or to any other relief based on the allegations set forth above.

**AFFIRMATIVE DEFENSES**

Without assuming the burden of proof or persuasion where such burden properly rests with Plaintiffs, without waiving and with hereby expressly reserving the right to assert any and all such defenses at such time and to such extent as discovery and factual developments establish a basis therefor, Ms. Urgo and Bridget Urgo Home hereby assert the following defenses:

**First Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

**Second Defense**

Plaintiff's Third Count fails to state a claim because Plaintiff has not alleged that it has obtained a copyright registration for any work at issue, as required by 17 U.S.C. § 411(a).

**Third Defense**

Plaintiff's copyright counts fail to state claims because Plaintiff fails to identify with sufficient particularity the specific works subject to its purported ownership claim; moreover,

Plaintiff cannot recover for alleged infringement of any work not covered by the alleged registration.

**Fourth Defense**

Plaintiff's claims are barred, in whole or in part, because at all times Ms. Urgo was acting within the scope of her professional collaboration, fully authorized and with consent.

**Fifth Defense**

Plaintiff's claims are barred, in whole or in part, because Ms. Urgo was fraudulently induced into executing the NCA.

**Sixth Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver and estoppel.

**Seventh Defense**

Plaintiff's claims for further injunctive relief are barred because Plaintiff has an adequate remedy at law and cannot demonstrate irreparable harm.

**Eighth Defense**

Plaintiff's Tenth Count fails to state a claim under CUTPA because Plaintiff fails to sufficiently allege any actionable immoral, unconscionable or oppressive conduct or any ascertainable loss distinct from Plaintiff's contract-based allegations.

**Ninth Defense**

Plaintiff's recovery is barred, in whole or in part, because any such recovery must be offset by amounts owed to Ms. Urgo.

Defendants reserve the right to amend their defenses as discovery is ongoing.

## COUNTERCLAIMS

Defendants/Counterclaim Plaintiffs Bridget Urgo Home LLC and Bridget Urgo ("Counterclaim Plaintiffs" or "Ms. Urgo"), by and through undersigned counsel, as Counterclaim Plaintiffs against The Settler and Jacqueline Randall[1], hereby allege as follows:

## PARTIES

1. Counterclaim Plaintiff Bridget Urgo Home LLC is a Connecticut limited liability company with a principal place of business in New Canaan, Connecticut.

2. Counterclaim Plaintiff Bridget Urgo is a natural person residing in New Canaan, Connecticut.

3. Counterclaim Defendant The Settler, LLC is a Connecticut limited liability company with a principal place of business in Darien, Connecticut.

4. Counterclaim Defendant Jacqueline Randall ("Ms. Randall") is the sole member of The Settler, LLC, and resides in Darien, Connecticut.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and § 1338, including original exclusive jurisdiction for the claim arising under the Copyright Act.

6. This Court has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy as the claims in the Complaint (ECF No. 1), share the same common nucleus of operative fact and are sufficiently related to The Settler, LLC's prayer for relief.

7. Venue is proper in this District under 28 U.S.C. § 1391.

[1] Jacqueline Randall is being joined pursuant to a contemporaneously filed Motion for Joinder (ECF No. 84).

**FACTS COMMON TO ALL COUNTERCLAIMS**

8. Prior to affiliating with The Settler, LLC (hereafter "Settler" or "Counterclaim Defendant"), Bridget Urgo created a home-organization business called B. Organized Home ("BOH").

9. BOH was built by Ms. Urgo over the course of six years, using self-taught skills in both home organization as well as business management.

10. Ms. Urgo grew her business organically, utilizing social media, positive referrals and word-of-mouth to increase her client list and grow her brand.

11. Ms. Urgo utilized tools she personally created to manage and grow her business and her business network, including organizational systems, policies, training guides and marketing materials.

12. Ms. Urgo's success led to various professional collaborations and connections with local partners, including realtors, brokerages and photographers—all informally partnering with BOH for strategic cross-promotion.

13. The Settler became an informal strategic partner of BOH in 2022, after Ms. Urgo became acquainted with Ms. Randall by way of introduction from Ms. Rachel Rand, Ms. Urgo's sister.

14. The Settler, historically a move-management business, is a family-owned business started and operated by Ms. Randall's mother-in-law, Esther "Pinny" Randall, until it was handed down to Jaqueline on or around March 31, 2023.

15. Prior to the collaboration with Ms. Urgo, the Settler did not offer professional home organization services.

16. Residential move-management and professional home-organization are distinct categories of service, involving different skillsets and operational systems of implementation.

17. Move management handles the logistics and coordination needed to move someone out of a home. This work focuses on managing vendors, creating timelines, coordinating the movers, and handling the packing before the move. These providers typically offer unpacking and basic home set-up services for clients who hire them for the full move.

18. Professional organization is a distinct spatial design discipline focused on establishing functional, structured living systems within a new or existing home. Starting with a personal consultation and full inventory of a client's belongings, this service includes custom space planning, selecting organizing products, labeling, and organizing specific rooms. For clients who are relocating or renovating, it also includes turnkey setup of completely unpacking and setting up spaces like kitchens, closets, and living areas so the home is immediately operational, aesthetically refined, and tailored to the client's daily lifestyle.

19. Professional home-organization can be performed entirely independently of any move, but the two services might be offered in combination to optimize client experience.

20. These distinct categories are reflected in the Settler's marketing materials, which were reworked in part by Ms. Urgo to expand the scope of the Settler's offerings in a manner that would entice BOH's existing and prospective clientele to retain the combined venture as well.

21. The professional collaboration between Ms. Urgo and The Settler was initially successful, with both businesses utilizing cross-referrals to grow.

22. Ms. Urgo shared her expertise, work-product and social media presence to improve the Settler's nascent professional organization services.

23. After informally collaborating for the previous five months, Ms. Randall, together with her spouse Frederic "Breed" Randall, approached Ms. Urgo in or around August of 2023 about officially combining their businesses, representing to Ms. Urgo that she would be a co-owner of a joint business that offered both home-organization as well as move-management services. Using their personal relationship with Ms. Rand, Ms. Urgo's sister, Mr. and Ms. Randall cultivated Ms. Urgo's trust and induced her to agree to the proposal.

24. These representations were known to be false when made, or made with reckless disregard for their truth, to induce Ms. Urgo to contribute her expertise, BOH's intellectual property and social media presence to create and grow the Settler's professional home-organization services division.

25. In reliance on these representations, and with full consent and authorization of the Settler and Ms. Randall, Ms. Urgo did exactly that.

26. In reliance on these representations, and over a period of several years, Ms. Urgo implemented systemic changes that profited the Settler through shared access to and use of BOH's clients, service model, Instagram account, and several employees.

27. In reliance on these representations, Ms. Urgo changed her Instagram handle from @b-organizedhome to @settlerhome because she had a larger following and social media presence.

28. In reliance on these representations, Ms. Urgo authored and implemented training materials and curricula used to train the Settler's organization team, marketing materials and content specific to organization services, operations manuals, and standard operating procedures and policies governing the performance of organization services (collectively "BOH Works"), including but not limited to:

a. Bathroom Checklist

b. Kitchen Checklist

c. Settling Instructions Document Template

d. Organization SOP

e. SOP – Bathroom Organization

f. SOP – Kitchen Organization

g. SOP – Prospect Call Cheat Sheet

h. SOP – Premium Closet Organization

i. SOP – Professional Pantry Organization

j. SOP – Prospect Calls

k. SOP – How to Create Brother Labels.

29. These materials were created using expertise, systems, and methodologies developed independently by Ms. Urgo, prior to and outside the scope of any relationship with Settler.

30. Ms. Randall's false and/or reckless representations were made by Ms. Randall to induce Ms. Urgo to train Settler employees on the techniques of BOH so that the Settler's services and procedures could be elevated to conform to the standard expected by Ms. Urgo's clientele.

31. Ms. Urgo made these contributions in reliance on representations of the Settler and Ms. Randall that she would buy into the business at a fair price.

32. As a condition of continued collaboration, in or around September of 2023, the Randalls required Ms. Urgo to execute the NCA, representing prior to execution that it was a temporary formality that was required to satisfy certain high net worth clients' expectations.

33. Over the weekend and outside of office, Ms. Urgo was presented with the NCA by Mr. Randall, acting on behalf of Ms. Randall and The Settler, in the Randalls' driveway.

34. Ms. Urgo was reassured that it was "just for optics" to satisfy a particular high net worth client.

35. Ms. Randall described the NCA as "embarrassing" and suggested Ms. Urgo should not have to sign it.

36. In reliance on the Randalls' representations regarding the nature and purpose of the NCA, as well as regarding her imminent formalization as co-owner, Ms. Urgo executed the NCA.

37. Ms. Urgo was not represented by counsel at the time she signed the NCA. Nor did she receive any consideration for signing it.

38. Ms. Urgo did not sign the Settler's employee handbook and code of conduct, a document co-authored by Ms. Urgo and required to be signed by all employees of The Settler.

39. Thereafter, the Settler and Ms. Randall repeatedly, both privately and publicly, held out Ms. Urgo as a co-owner and/or partner of the Settler.

40. The Settler and Ms. Randall held out Ms. Urgo as a co-owner on both Instagram and the Settler's website, when the collaboration was announced in November of 2023 online.

41. The Settler and Ms. Randall held out Ms. Urgo as a co-owner in a December 2023 press release further announcing the collaboration.

42. The Settler and Ms. Randall held out Ms. Urgo as a co-owner and/or partner in direct communications to clients, both existing and prospective.

43. The Settler and Ms. Randall held out Ms. Urgo as a co-owner in newspaper and magazine articles regarding the business.

44. Consistent with her represented status as co-owner, Ms. Urgo was given broad access to the financial operations of the Settler, including check writing authority and the ability to take draws.

45. Consistent with her represented status as co-owner, Ms. Urgo managed personnel and vendors, and was given hiring/firing authority.

46. Ms. Urgo acquiesced to the co-branded use of her organization-side expertise, client list, intellectual property and goodwill, on the condition that her ownership interest would be formalized.

47. On or about March 27, 2026, Ms. Rand, pursuant to her work on behalf of The Settler and with full knowledge of Ms. Randall, filed an Amended Annual Report identifying Ms. Urgo as a managing member.

48. Notwithstanding that everyone was holding Ms. Urgo out to be, and treating her as, an owner, little progress was made about documenting the formality of the same. Indeed, Ms. Urgo repeatedly requested that Ms. Randall circulate a formal operating agreement, only to have Ms. Randall repeatedly reassure her. When Ms. Urgo would raise further concerns and note that the lack of formal operating agreement was contributing to tension, Ms. Randall replied "I don't even care that nothing has been made official."

49. From November 2023 to April 2026, Ms. Randall never finalized a written operating agreement and repeatedly changed proposed terms for any buy-in price, all the while capitalizing on Ms. Urgo's goodwill, expertise, client list, and intellectual property, but never being willing to formalize her ownership in the Settler or in fact delivering any voting rights or equity in the joint venture.

50. With the addition of Ms. Urgo's contributions and the creation of an organization division, the Settler experienced significant growth with revenues that exceeded previous years by at least 40%.

51. Following a period in which Ms. Urgo was paid for hours billed on a client by client basis, at the start of 2026 Ms. Urgo was removed from the payroll system in anticipation of financial reconciliation and formalization of her equity interest.

52. From January 2026 on, Ms. Urgo was not paid on regular intervals, but rather told to simply write checks to herself or "take draws."

53. Indeed Ms. Urgo was in fact encouraged to take draws by Ms. Randall, including in April 2026, shortly before the Settler filed suit.

54. While things progressed fine between the parties for awhile, on or around May 2026, Ms. Urgo became aware that Ms. Randall was using company funds for excessive personal expenses, including frequent charges to the business for cosmetic procedures, groceries, landscaping, home improvements, renovations and boat-related purchases.

55. Ms. Urgo further became aware that large amounts of petty cash were unaccounted for.

56. Relatedly, in or around April 2023, Ms. Randall disclosed that she had purchased Settler from her mother-in-law for approximately $400,000 to be paid from her personal funds, but the Settler's own QuickBooks and bank records appeared to show payments exceeding $7,000 per month to Pinny Randall in connection with that obligation.

57. In or around the Spring of 2024, Ms. Urgo requested a proper business valuation so an operating agreement could be formalized.

58. The Settler's accountant, Dave Jacobsen, recommended a valuation expert: Irina Comer ("Irina" or "Ms. Comer").

59. When Ms. Comer had difficulty reconciling certain financial information, including profit and loss reports that did not reconcile with tax returns, she reached out to the Randalls and Ms. Urgo for further information.

60. Mr. Randall, acting on behalf of Ms. Randall and The Settler, responded by admitting the profit and loss information provided could not reconcile for various reasons—including that Ms. Urgo had "effectively rolled her business into the Settler".

61. Ms. Urgo was then removed from email communications concerning the valuation and Irina was terminated.

62. Mr. and Ms. Randall, acting on behalf of The Settler, thereafter obtained a new valuation online with a value of approximately $850,000.

63. On information and belief, the valuation was excessive. Ms. Urgo thus requested further financial support for the $850,000 figure.

64. Ms. Urgo's accountants reached out to Dave Jacobsen to request further information on the valuation. Dave responded with "can you please send me a copy of the valuation I haven't seen it". Followed by, "Breed hired that new evaluator to get the higher number he wanted and I have no idea how he got to that number".

65. On or around August 29, 2025, the parties exchanged proposed terms of sale which included a valuation of $650,000, with 50% equity, profit share and voting rights, a $100,000 downpayment, and the assumption of outstanding debt still owed to Pinny Randall.

66. The agreement was retroactive to January 1, 2025, meaning that Ms. Urgo would receive back-compensation on the profit share for that year.

67. Despite substantial agreement on the material terms, negotiations continued throughout the next six months because Ms. Randall continuously failed to provide access to certain information required to verify the numbers proposed, including but not limited to information about the circumstances of the debt owed to Pinny Randall. Rather than provide the requested information, Ms. Randall, on or around 3:00am on April 24, 2026, circulated a revised valuation of approximately $650,000, proposing that Ms. Urgo pay a total $325,000 after a $100,000 downpayment in exchange for a 50% ownership interest with equal voting rights.

68. Ms. Randall's proposal, moreover, effectively eliminated any retroactive profit-share compensation for the previous years of Ms. Urgo's contributions as a purported co-owner.

69. On April 27, 2026, Ms. Randall circulated a formal written proposal that reduced Ms. Urgo's voting control from the previously circulated 50/50 split to a 51/49 split in favor of Jacqueline.

70. Ms. Urgo responded via text that Ms. Randall was not providing information and repeatedly changing the proposed terms of the sale. In response, Ms. Randall issued an ultimatum: agree to the revised terms or get pushed out.

71. On May 8, 2026, Ms. Urgo responded in writing, explaining certain points of disagreement with the newly proposed terms and requesting a meeting with Dave Jacobsen, Mr. Randall and other advisors to review the financials and partnership history.

72. Ms. Randall then revoked Ms. Urgo's access to the Settler's systems, freezing her out of the business entirely.

73. In connection with these discussions, Ms. Urgo requested the Settler's 2025 tax return to verify tax liabilities Ms. Randall asserted Ms. Urgo would have to pay for as a condition of any retroactive profit share.

74. Ms. Randall responded by falsely representing the tax return had been filed. When Ms. Urgo's renewed her request for the tax return, Ms. Randall thereafter admitted that the return in fact had not yet been filed.

75. On May 11, 2026, Ms. Urgo proposed a separation plan designed to split the clients that were on the organization side from those on the move-management side in a transparent, fair manner.

76. On May 12, 2026, the Settler filed a withdrawal of Ms. Urgo as a managing member with the Connecticut Secretary of State.

77. Twelve days later, on May 27, 2026, the Settler commenced suit.

78. Prior to Ms. Urgo's affiliation with Settler, it performed only residential move management services and did not operate, offer, or advertise any professional organization service line.

79. The entire professional organization division of the combined enterprise—including its client relationships, service model, brand, and all associated intellectual property, including training materials and curricula, marketing materials and content, operations manuals, and standard operating procedures and policies —was created, developed, and contributed by Ms. Urgo using expertise, systems, and methodologies she developed independently of Settler.

80. Mr. Randall acknowledged that Ms. Urgo had "effectively rolled her business into" the Settler, a combination that increased the Settler's revenues by at least 40%.

81. The Prospect Log Sheet (Pl. Ex. 41 to the Motion for Preliminary Injunction) includes numerous clients who engaged Ms. Urgo, or the combined enterprise, exclusively for professional organization services and who had no residential move management relationship with

Settler, including clients who were Ms. Urgo's own clients prior to, or independent of, any affiliation with Settler.

82. Following entry of the Court's July 10, 2026 preliminary injunction, as clarified by the Court's July 16, 2026 Order (ECF No. 62), Ms. Urgo has been enjoined from providing services, including professional organization services, to any client on the Prospect Log Sheet.

83. Ms. Urgo has requested that the Settler agree to remove certain preexisting organization-only clients from the operative scope of the injunction by stipulation, but the Settler has refused to agree to any such stipulation, and, as a direct and proximate result, Ms. Urgo has been forced to decline and forgo numerous organization engagements scheduled for the summer of 2026, resulting in lost goodwill, income and business opportunities in an amount to be proven at trial.

84. As a direct and proximate result of the conduct described above, Ms. Urgo has been unable to continue client relationships she cultivated years before her affiliation with the Settler that she later shared with the Settler for the purpose of increasing revenues for organization-side work in what Ms. Urgo was told would be a joint venture.

85. As a direct and proximate result of the conduct described above, Ms. Urgo has been deprived of the value of:

a. the business she built prior to her relationship with the Settler;

b. the value of a represented and agreed upon 50% equity interested in the combined enterprise;

c. the value of the intellectual property she created for the organization division of the Settler;

d. the value of ongoing business opportunities with her own pre-existing and organization-only clients; and

e. the value of compensation for substantial uncompensated work performed on Settler's behalf.

**COUNT ONE**
**DECLARATORY JUDGEMENT OF MEMBERSHIP STATUS PURSUANT TO THE DECLARATORY JUDGMENT ACT, § 28 U.S.C. § 2201**
**(*The Settler and Ms. Randall*)**

86. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

87. An actual and justiciable controversy exists between the parties as to whether Ms. Urgo was a member of the Settler, LLC.

88. Prior to the collaboration with Ms. Urgo, Jacqueline was the sole member of the Settler as of March 2023.

89. Pursuant to the Connecticut Uniform Limited Liability Company Act ("CULLCA"), Conn. Gen. Stat. § 34-255(c)(3), Ms. Urgo became a member of The Settler by virtue of consent of the sole member, Jacqueline Randall.

90. Ms. Randall consented to Ms. Urgo's membership in The Settler when, *inter alia*, she:

a. Repeatedly, over several years, represented that Ms. Urgo was a co-owner both privately and publicly, to clients, employees, affiliates and the public at large;

b. Engaged in a course of dealing throughout their partnership that demonstrated Ms. Urgo's ownership interest, including but not limited to Ms. Urgo's authority to write checks, take draws, manage and hire/fire personnel; and

c. Ratified the March 27, 2026 Amended Annual Report that identified Ms. Urgo as a managing member.

91. Counterclaim Plaintiffs are entitled to a declaration, pursuant to 28 U.S.C. §2201 that Ms. Urgo was, and remains, a member of the Settler, LLC, holding a membership interest in an amount to be determined at trial but in no event more than 50%, with further rights as the evidence establishes.

**<u>COUNT TWO</u>**
**MEMBER OPPRESSION PURSUANT TO**
**CONN. GEN. STAT. § 34-267(a)(5) (CULLCA)**
**(*The Settler and Ms. Randall*)**

92. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

93. Ms. Urgo is, and at all relevant times was, a member of the Settler by virtue of course of conduct and/or the consent of Ms. Randall pursuant to Conn. Gen. Stat. § 34-255(c)(3).

94. As alleged above, and as more fully set forth in Count One and herein by reference, Ms. Randall is a member and/or is in control of the Settler within the meaning of Conn. Gen. Stat. § 34-267(a)(5).

95. Ms. Randall's conduct, as more fully alleged above and herein by reference, constitutes conduct that is oppressive and was, is, or will be directly harmful to Ms. Urgo, within the meaning of Conn. Gen. Stat. § 34-267(a)(5)(B), and, in the alternative, constitutes conduct that is illegal or fraudulent within the meaning of Conn. Gen. Stat. § 34-267(a)(5)(A).

96. This conduct, including but not limited to Ms. Urgo being frozen out of the Settler's financial and operational systems within days of requesting a full reconciliation of the Settler's books, substantially defeated Ms. Urgo's reasonable expectations as a co-owner.

97. At this time, the Settler's website still actively represented Ms. Urgo was co-owner and the incoming prospects that engaged Ms. Urgo and The Settler for organization-only projects were not notified. Being removed from the website further substantially defeated Ms. Urgo's reasonable expectations as co-owner.

98. The foregoing expectations were central to her decision to contribute her business, employees, expertise, clients, and the BOH Works to the combined enterprise.

99. As a direct and proximate result of the oppressive conduct described herein, Counterclaim Plaintiffs have suffered damages in an amount to be proven at trial.

100. Under this Count Counterclaim Plaintiffs do not seek dissolution of the Settler, but rather, pursuant to Conn. Gen. Stat. § 34-267(b), request that the Court order such alternative remedies as are appropriate and just, including but not limited to a buyout of Ms. Urgo's membership interest at fair market value, an accounting, and/or an award of damages.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(*The Settler and Ms. Randall, Jointly and Severally*)**

101. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

102. A fiduciary relationship existed between Ms. Urgo and Ms. Randall, when, by virtue of her status as, *inter alia*, a "corporate promoter" of the Settler, she proposed that Ms. Urgo invest in a partnership with them.

103. As the sole owner of the family business, Ms. Randall had a position of superiority and influence over Ms. Urgo.

104. In her capacity as promoter and co-owner, Ms. Randall owed Ms. Urgo duties of good faith, care, loyalty and full disclosure.

105. Ms. Urgo reposed trust and confidence in the Ms. Randall, who cultivated that trust by repeatedly reassuring her that a proper valuation would be performed and that formalization of her equity interest would recognized both retroactively and going forward.

106. Ms. Randall had a duty to disclose material information to Ms. Urgo concerning the Settler's financial condition, the use of company funds, the valuation process, and the Settler's tax filings.

107. Ms. Randall breached the fiduciary duties arising from this relationship by

a. failing to formalize Ms. Urgo's equity interest;

b. failing to disclose the material information needed to value the business;

c. failing to disclose information regarding the use of the Settler's funds;

d. failing to provide tax filings and misrepresenting their filing status;

e. failing to provide an operating agreement that accurately reflected the parties' intentions;

f. failing to adequately compensate Ms. Urgo for the sweat equity poured into the company over a period of several years;

108. As a direct and proximate result of the actions of Ms. Randall and The Settler, Counterclaim Plaintiffs have suffered harm and actual damages.

**COUNT FOUR**
**ACCOUNTING**
**(*The Settler and Ms. Randall*)**

109. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

110. By virtue of Ms. Urgo's represented status as a co-owner with sweat equity in the Settler as of August 2023, a fiduciary and/or confidential relationship existed between the parties' concerning the management of the Settler's finances.

111. Counterclaim Defendants have refused to provide Ms. Urgo with complete financial records sufficient to determine the value of her interest, amounts owed to her, and whether company funds were properly expended and/or reported.

112. Counterclaim Plaintiffs have no adequate remedy at law and are entitled to a full and complete accounting of Settler's finances, income, expenses and distributions from January 2023 to the present.

**COUNT FIVE**
**FRAUDULENT INDUCEMENT**
**(*The Settler and Ms. Randall, Jointly and Severally*)**

113. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

114. Ms. Randall made false representations of material fact to Ms. Urgo, including that:

a. The parties were forming a bona fide partnership, not an employment relationship

b. She would become a 50% owner in the Settler with equal voting rights;

c. The NCA was a temporary formality to satisfy the demands of a high-net-worth client; and

d. Ms. Randall and The Settler would compensate Ms. Urgo for foregone profits during the years her co-ownership was not formalized.

115. These representations, when made by Jacqueline Randall, were known to be false, or made with reckless indifference to their truth.

116. These representations were made with the intent to induce Ms. Urgo to contribute her and BOH's intellectual property, employees, clients, and labor for the benefit of the Settler and the Randalls.

117. Ms. Randall engaged in a continuing course of conduct when she repeatedly and affirmatively reassured Ms. Urgo, from August 2023 through the end of the relationship, that her equity interest in the Settler was genuine and would be formalized and honored.

118. Ms. Urgo reasonably relied on these representations to her detriment.

119. As a direct and proximate result, Counterclaim Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT SIX**
**FRAUDULENT CONCEALMENT/FRAUD BY NONDISCLOSURE**
**(*The Settler and Ms. Randall, Jointly and Severally*)**

120. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

121. Ms. Randall had a duty to Ms. Urgo to make full and fair disclosure of material information relevant to Ms. Urgo's ongoing collaboration and the Settler's equity sale to Ms. Urgo, including but not limited to the intended use of the NCA, as well as:

a. previous and present financial condition of the Settler;

b. Valuation of the Settler;

c. use of company funds;

d. tax filings;

e. debts, including but not limited to any debts owed by the Settler and/or Jacqueline Randall to Esther "Pinny" Randall; and

f. ownership structure.

122. Ms. Randall failed to disclose this information when she:

a. induced Ms. Urgo to sign the NCA;

b. refused to provide certain financial information despite repeated requests;

c. terminated Ms. Comer and got the valuation that was "wanted";

d. circulated a draft operating agreement with unilaterally altered terms;

e. issued an ultimatum to coerce Ms. Urgo to sign on her terms.

123. Ms. Randall assumed a duty to speak about these known facts when she asked Ms. Urgo to become a co-owner of the Settler, a duty that continued throughout their professional collaboration throughout which they publicly and privately held Ms. Urgo out as co-owner.

124. These material nondisclosures were knowingly withheld and/or withheld with reckless indifference to the fact that Ms. Urgo was a purported co-owner, publicly acknowledged as such, with none of the compensation, voting rights or access to material financial information afforded for such a role.

125. This concealment was intended to induce Ms. Urgo to continue working for the Settler's benefit and to coerce Ms. Urgo into accepting revised terms for the sale.

**<u>COUNT SEVEN</u>**
**CUTPA Conn. Gen. Stat. § 42-110b *et seq*.**
**(*The Settler and Ms. Randall*)**

126. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

127. At all relevant times, Ms. Randall and the Settler were engaged in the conduct of trade or commerce within the meaning of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b et seq ("CUTPA").

128. Ms. Randall induced Ms. Urgo to invest in and contribute substantial labor and services to the Settler by representing and assuring her that her interest in the business would be properly valued and that her equity interest would be formally recognized, including retroactively.

129. Ms. Randall possessed substantially greater knowledge concerning the Settler's financial condition, operations, valuation, tax filings, debts and use of company funds than did Ms. Urgo.

130. Ms. Randall knew that Ms. Urgo was relying upon her representations and superior knowledge in determining the value and nature of Ms. Urgo's interest in the Settler.

131. Ms. Randall continuously deceived Ms. Urgo over a period of three years for the purpose of increasing their revenue by profiting off of the use of Ms. Urgo's intellectual property, client lists, labor and goodwill.

132. The Randalls engaged in unfair and deceptive acts and practices in connection with Ms. Urgo's collaboration with Settler, including, but not limited to:

a. repeatedly representing and reassuring Ms. Urgo that a proper valuation of the Settler would be performed and that her equity interest would be formally recognized;

b. failing to disclose material information necessary to properly value the Settler and Ms. Urgo's purported interest therein;

c. failing to disclose material information concerning the use of Settler funds;

d. misrepresenting the nature and scope of the NCA to induce Ms. Urgo's execution;

e. failing and refusing to provide tax filings and other financial information requested by Ms. Urgo;

f. failing to provide an operating agreement that accurately reflected the parties' intentions concerning Ms. Urgo's equity interest;

g. failing to adequately compensate Ms. Urgo for the substantial labor and "sweat equity" she contributed to the Settler over a period of several years;

h. using their superior knowledge, control of the Settler, and position of influence over Ms. Urgo to obtain and retain the benefits of Ms. Urgo's investment, labor, and contributions while failing to provide her with the corresponding ownership interest, compensation, or information to which she was entitled;

i. using coercive tactics to induce her cooperation with terms more favorable to the Settler and Jacqueline Randall; and

j. actively preventing Ms. Urgo from working with organization-only clients that were introduced to the Settler because of Ms. Urgo's collaboration as co-owner.

133. Not only has Ms. Urgo been forced to forego the "sweat equity" poured into the Settler collaboration, in addition, Ms. Urgo has been forced to "start over" with her own business without the client relationships and intellectual property she cultivated both before and after her collaboration with The Settler.

134. The foregoing conduct was unfair within the meaning of CUTPA because it offended established public policies concerning honest dealing, good faith, disclosure of material information, and the fair treatment of persons whose investments and contributions are solicited and accepted in connection with a business collaboration or shared enterprise.

135. The foregoing conduct was further unfair because it was immoral, unethical, oppressive, and/or unscrupulous, and because it induced her to invest in and contribute substantial labor and intellectual property into the business.

136. Ms. Randall's conduct constituted a course of conduct calculated to deceive Ms. Urgo so that her efforts could continue to enrich the Randalls by way of the Settler.

137. Counterclaim Defendants' unfair and deceptive conduct was a substantial factor in, as well as the direct and proximate cause of, ascertainable economic losses and actual damages suffered by Counterclaim Plaintiffs in an amount to be determined at trial.

138. Counterclaim Defendants' conduct was knowing, and/or reckless, and consequently, pursuant to Conn. Gen. Stat. § 42-110g, Counterclaim Plaintiffs are entitled to recover actual damages, punitive damages, costs, reasonable attorneys' fees, and such other equitable and injunctive relief as the Court deems just and proper.

**COUNT EIGHT**
**NEGLIGENT MISREPRESENTATION**
**(*The Settler and Ms. Randall, Jointly and Severally*)**

139. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

140. The Settler and Ms. Randall possessed unique or specialized knowledge regarding the valuation of the Settler, use of company funds, its overall financial condition, the purpose and nature of the NCA, and Ms. Urgo's ability to formalize her ownership interest.

141. The Settler and Ms. Randall supplied Ms. Urgo with false and incomplete information, as detailed above, about The Settler's valuation, use of company funds, overall financial condition, the purpose and nature of the NCA, and Ms. Urgo's ability to formalize her ownership interest.

142. The Settler and Ms. Randall knew or should have known, in the exercise of reasonable care, that the information supplied was inaccurate or incomplete, and knew or should have known that Counterclaim Plaintiffs would rely on it for business purpose.

143. Counterclaim Plaintiffs reasonably and justifiably relied on the false or incomplete information when continuing to provide expertise, labor, intellectual property, client relationships, goodwill and services to The Settler and Ms. Randall.

144. As a direct and proximate result of The Settler and Ms. Randall's negligent misrepresentations, Counterclaim Plaintiffs sustained pecuniary loss in an amount to be proven at trial.

**COUNT NINE**
**DECLARATORY JUDGMENT OF COPYRIGHT OWNERSHIP PURSUANT TO § 17 U.S.C. § 201; 28 U.S.C. § 2201**
**(*The Settler*)**

145. Counterclaim Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

146. An actual, justiciable controversy exists between Counterclaim Plaintiffs and the Settler regarding ownership of certain works created by Ms. Urgo, or at the direction of Ms. Urgo, for shared use throughout the professional collaboration between Counterclaim Plaintiffs and the Settler.

147. The BOH Works include, but are not limited to, materials authored or created in connection with the professional organization division of the combined enterprise, such as training videos and guides, marketing presentations, materials and content created for the rebranding, operations manuals and employee handbook(s) and/or code(s) of conduct, and standard operating procedures and policies, including but not limited to:

a. Bathroom Checklist
b. Kitchen Checklist
c. Settling Instructions Document Template
d. Organization SOP

e. SOP – Bathroom Organization

f. SOP – Kitchen Organization

g. SOP – Prospect Call Cheat Sheet

h. SOP – Premium Closet Organization

i. SOP – Professional Pantry Organization

j. SOP – Prospect Calls

k. SOP – How to Create Brother Labels

l. Brochure Information

m. Brochure Picture 1

n. Bridget Urgo Business Card

o. Settler Logo; and

p. Settler Professional Move Management Overview.

148. The BOH Works were authored by, co-authored by, or created at the direction of Ms. Urgo with the assistance of employees brought to the combined enterprise by Ms. Urgo.

149. Ms. Urgo possessed specialized skills required to create the BOH Works, skills which were applied as part of a collaboration in which Ms. Urgo was represented to be a co-owner—not an employee.

150. Ms. Urgo exercised the right to control the manner and means of creating the BOH Works, controlling both its dissemination and use within The Settler.

151. Ms. Urgo was not subject to any control over the creation or use of the BOH Works in any manner that resembles an employer-employee relationship.

152. Ms. Urgo is the sole or joint author and/or owner of the BOH Works, which do not constitute "works made for hire" within the meaning of 17 U.S.C. § 101.

153. Counterclaim Plaintiffs are entitled to a declaration, pursuant to 28 U.S.C. § 2201 that Ms. Urgo is the sole or joint owner of the BOH Works.

**COUNT TEN**
**UNJUST ENRICHMENT - in the Alternative**
**(*The Settler and Ms. Randall*)**

154. Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 112 and Paragraphs 126 through 153 as if fully set forth herein.

155. In the alternative, and only to the extent no valid, enforceable contract is found to govern the parties' ownership rights,  Ms. Urgo provided significant benefits to Ms. Randall and The Settler when she was induced to "roll her business" into The Settler.

156. The Settler and Ms. Randall were benefited by Ms. Urgo's contributions, including but not limited to, the BOH Works, personnel, goodwill, client relationships, Instagram account following and content library, service model, Ms. Urgo's expertise.

157. The Settler increased revenues by at least 40% in the three years Ms. Urgo collaborated with The Settler.

158. The Settler and Ms. Randall were benefited by Ms. Urgo's foregone profits as co-owner.

159. The Settler and Ms. Randall have unjustly failed to pay Ms. Urgo for these benefits, despite repeatedly holding her out as co-owner.

160. It is contrary to equity and good conscience for The Settler and Ms. Randall to retain the foregoing benefits at the expense of Counterclaim Plaintiffs.

161. The Settler and Ms. Randall have been unjustly enriched and their failure to pay has caused a determinant to Counterclaim Plaintiffs in an amount to be determined at trial.

**COUNT ELEVEN**
**PROMISSORY AND EQUITABLE ESTOPPEL - in the Alternative**

**(*The Settler and Ms. Randall*)**

162. Counterclaim Plaintiffs repeat and reallege Paragraphs 1 through 112 and Paragraphs 122 through 161 as if fully set forth herein.

163. In the alternative, and only to the extent the representations described above are found not to have been fraudulent and only to the extent no valid, enforceable contract is found to govern the parties' ownership rights, Ms. Randall and The Settler made clear, definite and unambiguous promises to Ms. Urgo that include but are not limited to that:

a. She was or would become a 50% owner of the Settler with equal voting rights;

b. such interest would be formalized through legal documentation;

c. she would be compensated for the "sweat equity" poured into the joint enterprise; and

d. she would be compensated retroactively for foregone profits.

164. The Settler and Ms. Randall should reasonably have expected these promises to induce Ms. Urgo to act, or forbear from acting, in reliance on them.

165. Counterclaim Plaintiffs reasonably relied on these promises.

166. Counterclaim Plaintiffs reliance on these promises was reasonable and foreseeable.

167. Counterclaim Plaintiffs have been damaged as a result of that reasonable reliance in an amount to be determined at trial.

168. Injustice can only be avoided by Court enforcement of the foregoing promises.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of Ms. Urgo and Bridget Urgo Home LLC and against Counterclaim Defendants on each Count of the Counterclaims;

b. Declare that Bridget Urgo is a member of The Settler by virtue of consent of its sole member, Jacqueline Randall;

c. Award damages in an amount the Court deems a just and proper fair market value of her interest;

d. Order an accounting;

e. Declare that Bridget Urgo is the sole or joint owner of any intellectual property created by her to support the organization side of the Settler after her co-ownership was announced;

f. Declare that Ms. Urgo can resume organization work immediately for any shared clients;

g. Award compensatory damages in an amount to be proven at trial;

h. Award punitive damages under CUTPA;

i. Fees and costs to the fullest extent allowable; and

j. Such other relief as the Court deems just and proper.

**JURY DEMAND**

Counterclaim Plaintiffs expressly demand trial by jury of all claims so triable.

Dated: Southport, Connecticut
August 31, 2026

Respectfully submitted,

*/s/ Brian E. Spears*
Brian E. Spears
Federal Bar No. ct14240
Armel L. Jacobs
Federal Bar No. ct29608
SPEARS MANNING & MARTINI LLC
2425 Post Road, Suite 203

Southport, CT 06890
Telephone: (203) 292-9766
Facsimile: (203) 292-9682
Email: bspears@spearsmanning.com
ajacobs@spearsmanning.com

/s/ *William N. Sinclair*
William N. Sinclair
Federal Bar No. phv209577
SILVERMAN THOMPSON
400 E. Pratt St., Suite 900
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: bsinclair@silvermanthompson.com

*Counsel for Counterclaim Plaintiffs Bridget Urgo Home LLC and Bridget Urgo*

**CERTIFICATION**

I hereby certify that on August 31, 2026, a copy of the foregoing was served electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

/s/ *Brian E. Spears*
Brian E. Spears